# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Chuck Saleen and Eugene T. Brown, individually and on behalf of others similarly situated, | Civ. No. 08-4959 (PJS/JJK) |
| Plaintiffs, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| Waste Management, Inc., | |
| Defendant. | |

This matter is before the Court on Plaintiffs' Motion for 29 U.S.C. § 216(b) Conditional Class Certification, Judicial Notice, and Equitable Tolling (Doc. No. 89).  The Court held a hearing on Plaintiffs' motion on May 21, 2009.[1]  For the reasons articulated below, and based on the file, all the records and proceedings herein, and the arguments of counsel, the Court denies Plaintiffs' motion to conditionally certify this matter as a collective action, facilitate judicial notice, and equitably toll the statute of limitations.

---

[1]      Shortly before the May 21, 2009 hearing, Plaintiffs filed a Motion to Supplement the Factual Record for Conditional Class Certification, Judicial Notice, and Equitable Tolling.  (Doc. No. 137.)  At the hearing, the Court inquired whether Defendant had any response to this supplemental motion, and defense counsel indicated that Defendant did not object to the motion.  Therefore, the Court grants Plaintiffs' Motion to Supplement the Factual Record for Conditional Class Certification, Judicial Notice, and Equitable Tolling (Doc. No. 137), and will consider the materials submitted in support thereof.

# FACTUAL BACKGROUND

Defendant Waste Management, Inc. ("WMI"),[2] is a corporation that

provides sanitation and trash-collection services throughout the United States.

(Doc. No. 1, Compl. ¶ 3.) The named Plaintiffs in this matter were employed by

WMI as drivers of WMI's trash-collection vehicles in Minnesota and Missouri. (*Id.*

¶¶ 4-5.) On August 18, 2008, Plaintiffs filed a Complaint, in behalf of themselves

and other similarly situated individuals nationwide, alleging that WMI violated the

Fair Labor Standards Act ("FLSA") by failing to pay required overtime

compensation. (*Id.* ¶¶ 7, 11, 16.)

Specifically, Plaintiffs, and the 211 individuals who have filed a notice of

consent form to join this litigation,[3] allege that they "work similar waste-collection

---

[2]     Throughout this litigation, WMI has taken the position that it is not the
proper defendant in this action because it is merely a holding company, and its
various operating entities around the country are "employers" within the meaning
of the Fair Labor Standards Act. (*See, e.g.*, Doc. No. 134, Def.'s Opp'n to Pls.'
Mot. for 29 U.S.C. § 216(b) Conditional Certification, Judicial Notice, and
Equitable Tolling ("Def.'s Mem.") 1 n.1.) To the extent that the Court hereinafter
refers to WMI as an employer and to the Plaintiffs and putative members of the
collective action as employees, it intends to render no opinion regarding the
merits of WMI's position, but does so for the sake of convenience.

[3]     Under 29 U.S.C. § 216(b), an employee may opt-in to a collective action
against an employer by giving his or her consent in writing to become a party to
an action brought on behalf of other employees similarly situated. At the time
Plaintiffs filed their supporting memorandum concerning the instant motion, 202
individuals had filed written consent forms to opt-in to this case. (Doc. Nos. 2-10,
12, 16-20, 24-36, 41-47, 50-55, 59-60, 65-66, 68-71, 76-82, 88, 91, 94-95, 99-
105, 108-116, 123.) Since that time, nine additional consent forms have been
filed (Doc. Nos. 130, 142, 143, 145, 146), bringing the total number of "opt-ins" to
211.

jobs, perform[] similar duties for the same company, under the same time-keeping system, and they are all subject to a uniform automatic-deduction pay policy that . . . results in the continuous underpayment of wages to waste collection employees nationwide." (Doc. No. 127, Pls.' Mem. of Law in Supp. of their Mot. for Conditional Class Certification, Judicial Notice, and Equitable Tolling ("Pls.' Mem.") 1.) The "automatic-deduction pay policy" to which Plaintiffs refer is WMI's time-keeping system that automatically deducts a 30-minute meal break from its employee's time records. (Doc. No. 128, Aff. of Paul Lukas in Supp. of Pls.' Mot. for Conditional Class Certification, Judicial Notice, and Equitable Tolling ("Lukas Aff.") ¶ 3, Ex. E at 4.) This meal-period policy states the following:

> It is Waste Management's Policy that employees take at least a 30-minute meal break during the course of the workday. . . . Unless prior approval has been obtained from the employee's supervisor, all non-exempt employees working six (6) or more hours in any day are required to take an unpaid meal break of 30 minutes. During such meal breaks, employees are relieved of <u>all</u> work-related duties and or explicitly prohibited from performing any work-related tasks during this 30-minute period.
>
> . . . .
>
> Employees who are working away from the facility are required to take a 30-minute meal break. All off-site employees will automatically have thirty (30) minutes deducted from his or her time for the daily meal break and <u>must obtain prior approval</u> from his or her immediate supervisor to deviate from their scheduled meal break.
>
> If an employee does not take the full thirty minutes away from all work related duties as required, the employee must notify his or her supervisor, complete a Kronos Start Time Meal Break Exception

Form informing Waste Management of the time deficit and have the
form signed by his or her supervisor.

(*Id.* (emphasis in original).)

The parties' submissions indicate that this policy's procedure for reversing

the automatic deduction of 30 minutes from an employee's time records operated

differently throughout the system of WMI's operating entities.  Defendant

indicates that depending on the operating entity and time-period in question,

there were different ways for the drivers and other waste-collection employees to

track, for time-keeping purposes, meal breaks taken and skipped.  (Def.'s Mem.

6-8.)  For instance, according to Defendant, employees tracked their meal breaks

by recording the time actually spent working on timesheets or "route cover

sheets," or by telling their supervisors when they did not take a break, or by

transmitting a signal from a device in their vehicles, or, at some facilities, by

pressing a button on a time clock at the facility to indicate that they did not take a

meal break.  (*Id.* at 7-8.)  Near the end of 2007, WMI adopted a newer,

apparently more uniform means for employees to reverse the automatic

deduction.  In this newer system, WMI's drivers and other waste-collection

employees would be prompted on a screen at their facility's time-clock to indicate

electronically whether they had taken a meal break during their shifts.  (Pls.'

Mem. 8.)  If an employee answers that he or she did not take a meal break, then

the 30-minute deduction is reversed.  Plaintiffs do not seek certification of and

notice to the group of waste-collection employees who worked under this newer time-recordation system adopted in late 2007.  (*Id.* at 10.)

Most of the Plaintiffs, the 211 opt-ins, and the 112 declarants who have provided statements in support of Plaintiffs' conditional-certification motion assert that despite the required meal-break and automatic-deduction policy, they were rarely (and in some cases never) able to take an entire 30-minute break. Further, they allege that WMI failed to compensate them for the many occasions when they worked through such meal breaks.  (*See generally* Lukas Aff. ¶ 3, Ex. J (containing declarants' statements that they were not compensated for all overtime hours worked because they were unable to record time spent working through lunch breaks); Doc. No. 139, Aff. of Rebekah L. Bailey in Supp. of Pls.' Mot. to Supplement the Factual Record ("Bailey Aff.") ¶ 2, Exs. R-T (same).)

The parties do not dispute that there are nearly 20,000 to 30,000 current and former drivers eligible for inclusion in the collective action, and to whom notice would be sent under the Plaintiffs' proposal for court-facilitated notice. (Pls.' Mem. 36-37; Def.'s Mem. 32.)  WMI asserts that these individuals work at approximately 820 locations in 47 states.  (Defs.' Mem. 32.)

## DISCUSSION

## I.    Legal Standard for Conditional Certification

As noted above, this case involves claims under the FLSA for WMI's alleged failure to pay overtime compensation to its drivers and other waste-collection employees for the uncompensated time, in excess of forty hours in a

given week, worked through non-existent meal breaks.  The FLSA requires employers to provide such overtime compensation to employees at a rate of one and one-half times their regular rate of compensation.  *See generally* 29 U.S.C. § 207.  Any employer who violates this overtime-compensation requirement "shall be liable to the employee or employees affected in the amount of their . . . unpaid overtime compensation, . . . and in an additional equal amount as liquidated damages."  29 U.S.C. § 216(b).

When employees believe such violations have occurred, "[t]he FLSA allows employees to bring a collective action 'for and in behalf of . . . themselves and other employees similarly situated.'"  *Frank v. Gold'n Plump Poultry Inc.*, 04-1018 (JNE/RLE), 2005 WL 2240336, at *2 (D. Minn. Sept. 14, 2005) (quoting 29 U.S.C. § 216(b)).  "The process by which putative plaintiffs, in a FLSA collective action, are joined, is commonly referred to as the 'opt-in' process, and Courts may facilitate that procedure by authorizing the named Plaintiffs in a FLSA action to transmit a notice to potential class members."  *West v. Border Foods, Inc.*, Civ. No. 05-2525 (DWF/RLE), 2006 WL 1892527, at *2 (D. Minn. June 12, 2006) (citing *Hoffman-LaRoche, Inc. v. Sperling*, 493 U.S. 165, 170 (1989)).  The determination whether to judicially authorize and facilitate such notice rests within the discretion of the district court and should only be provided in "appropriate cases."  *See Hoffman-LaRoche*, 493 U.S. at 169 (holding that "district courts have discretion, *in appropriate cases*, to implement 29 U.S.C. § 216(b) . . . in . . . actions by facilitating notice to potential plaintiffs") (emphasis added).

"'The fundamental inquiry in determining whether a collective action under Section 216(b) is appropriate is whether or not the plaintiffs are similarly situated.'" *West*, 2006 WL 1892527, at *7 (quoting *Smith v. Heartland Auto. Servs., Inc.*, 404 F. Supp. 2d 1144, 1149-50 (D. Minn. 2005)) (quotations and alterations omitted).  The FLSA does not, however, define the term "similarly situated."  *See* 29 U.S.C. § 216(b).  Thus, "[c]ourts generally approach this inquiry in two stages.  First, a plaintiff may seek conditional certification of a collective action, authorizing notice to potential opt-in plaintiffs." *Smith*, 404 F. Supp. 2d at 1149.  Plaintiffs bear the burden at this stage.  *See Grayson v. K Mart Corp.*, 79 F.3d 1086, 1096 (11th Cir. 1996).  If conditional certification is granted, the second stage is typically precipitated by a motion by the defendant to decertify the case as a collective action.[4]  *See Kalish v. High Tech Inst., Inc.*, No. Civ. 04-1440 (JRT/JSM), 2005 WL 1073645, at *1 (D. Minn. Apr. 22, 2005).

"At [the] conditional certification stage, the plaintiffs need only come forward with evidence establishing a colorable basis for their claim that the putative class members were together the victim of a single decision, policy, or plan." *Frank*, 2005 WL 2240336, at *2.  "A colorable basis means that plaintiff

---

[4]    The parties do not dispute that we are at the first stage of the two-stage process followed in this District for certification of a collective action.  "Although magistrate judges do not have jurisdiction to authorize final certification of a class (*see* 28 U.S.C. § 636(b)(1)(A)), this Court has jurisdiction over motions seeking conditional class certification because they are only preliminary determinations that are not dispositive." *Barrus v. Dick's Sporting Goods, Inc.*, 465 F. Supp. 2d 224, 229 n.1 (W.D.N.Y. 2004) (citing *Patton v. Thomson Corp.*, 364 F. Supp. 2d 263, 265-66 (E.D.N.Y. 2005)).

must come forward with something more than the mere averments in its complaint in support of its claim." *Severtson v. Phillips Beverage Co.* ("*Severtson II*"), 141 F.R.D. 276, 278-79 (D. Minn. 1992).

In addition to showing a colorable basis that the putative collective plaintiffs were together the victims of a single decision, policy, or plan, "[a]t this stage [plaintiffs must show] that factual similarities or differences among the putative [p]laintiffs are such that the case may be properly managed as a collective action." *West*, 2006 WL 1892527, at *9-10 (citing *Ray v. Motel 6 Operating Ltd. P'ship*, No. 3-95-828, 1996 WL 938231, at *4 (D. Minn. Mar. 18, 1996), and *Severtson v. Phillips Beverage Co.* ("*Severtson I*"), 137 F.R.D. 264, 266 (D. Minn. 1991)). "The Court does not make any credibility determinations or findings of fact with respect to contrary evidence presented by the parties at this initial stage." *Dominquez v. Minn. Beef Indus., Inc.*, Civ. No. 06-1002 (RHK/AJB), 2007 WL 2422837, at *2 (D. Minn. Aug. 21, 2007) (citing *Frank*, 2005 WL 2240336, at *3 n.2)). But "neither the remedial purposes of the FLSA, nor the interests of judicial economy, would be advanced if we were to overlook facts which generally suggest that a collective action is improper." *West*, 2006 WL 1892527, at *7 (citing *Basco v. Wal-Mart Stores, Inc.*, 2004 WL 1497709, at *5 (E.D. La. July 2, 2004), and *Ray*, 1996 WL 938231, at *4).

## II.  Analysis

Plaintiffs contend that they have sufficiently shown themselves to be "similarly situated" to the putative members of the collective action for purposes

of conditional certification.  The Court concludes, however, that Plaintiffs have failed to provide a colorable basis that they and the putative members of the collective action are similarly situated with respect to a single decision, policy, or plan.  As discussed below, the Court reaches this conclusion because (1) Plaintiffs' evidentiary showing reveals no single decision, policy, or plan behind the instances of WMI's alleged failure to provide overtime compensation, and (2) the record demonstrates that this case cannot be effectively managed as a collective action.

### A.     No Single Decision, Policy, or Plan

Plaintiffs first argue that they and the potential class members were all "[s]ubject to the [s]ame [r]elevant [p]olicy and [p]ractice," which Plaintiffs identify as "a uniform automatic deduction policy that deducted time from their recorded hours irrespective of whether they took full, uninterrupted breaks as presumed by [the time-keeping system in place during the relevant period]."  (Pls.' Mem. 15, 19.)  Under Plaintiffs' theory, the collective would include every WMI worker who ever worked through a meal break and then did not have the automatic deduction reversed before the new reversal system was put in place in late 2007.  The fundamental problem here is that the automatic-deduction policy does not, on its face, state that employees will not be paid if they have worked through their meal breaks.[5]  Indeed, it provides a mechanism (the "Kronos Start Time Meal Break

---

[5]        *See* quoted language *supra* p. 3-4.

Exception Form") for employees to reverse the automatic deduction if they have missed the meal break and thus get paid for the time worked. In these circumstances, Plaintiffs "must submit evidence that the *reason* why the employees were not compensated for [working through meal breaks] is . . . because of a corporate decision to ignore [WMI's] published policies and refuse to pay for [working through meal breaks]."[6] *See Thompson v. Speedway SuperAmerica, LLC*, No. 08-CV-1107 (PJS/RLE), 2009 WL 130069, at *2 (D. Minn. Jan. 9, 2009) (noting further that absent a published corporate policy not to compensate for work performed, plaintiffs should "establish a colorable bases that such a policy-to-violate-the-policy exists") (emphasis in original).

Plaintiffs' offer of proof in support of their motion appears to advance the theory that WMI's enforcement of the automatic-deduction policy created a policy-to-violate-the-policy. In support of this theory, Plaintiffs have submitted the declarations of 112 WMI employees who state that they have been denied compensation for time spent working through meal breaks during the statutory period. (Lukas Aff. ¶ 3, Ex. J; Bailey Aff. ¶ 2, Exs. R-T.) Plaintiffs have also

---

[6]     Individually, of course, a driver may have a claim for overtime pay if he worked through the meal period and did not get paid for that time whether or not the failure to pay for that time worked was part of some nationwide single decision, policy, or plan. Or a group of drivers at a particular WMI facility might have an appropriate collective claim if the management at that locale had a single policy of not permitting the drivers at that location to reverse the automatic deduction when they worked through lunch; some of the declarants in fact complain about such practices at their local facilities. However, neither the merits of any individual claim nor the conditional certification of any sub-collective is before the Court at this time.

submitted excerpts from the deposition testimony of the named Plaintiffs. (Bailey Aff. ¶ 2, Exs. A-E.) All 112 declarations and the deposition excerpts suggest that the declarants' and deponents' supervisors emphasized productivity and exerted pressure on the drivers and other waste-collection employees to work through lunch. And each of these individuals has sworn that during the majority of shifts, he or she worked through the meal break and was not compensated for that time. (*See id.* ¶ 2, Exs. A-E (including deposition excerpts); *id.* ¶ 2, Ex. U at 5 (illustrating that all 112 declarations stated that they "[n]ever or rarely took lunch").) From the experiences of these individuals, Plaintiffs ask the Court to infer that WMI had a common, nationwide, unlawful policy not to compensate for untaken meal breaks. But Plaintiffs have not come forward with sufficient support for the Court to draw such an inference. The reasons alleged for WMI's failure to compensate are too varied for the Court to conclude that there is a single decision, policy, or plan by WMI to not compensate its drivers and other waste-collection employees for time worked through meal breaks.

For instance, 38 of the 112 declarants state that they were not compensated because they were unaware of a way to reverse the automatic deduction.[7] Another 33 of the declarants state that they were told (or that it was

---

[7]     Lukas Aff. ¶ 2, Ex. J(11), J(13), J(15), J(16), J(21), J(22), J(26), J(27), J(31), J(34), J(35), J(36), J(37), J(38), J(43), J(45), J(46), J(49), J(50), J(51), J(52), J(58), J(61), J(63), J(68), J(76), J(77), J(80), J(82), J(83), J(89), J(90), J(94), J(96), J(100), J(102); Bailey Aff. ¶ 2, Exs. S, T.

made clear to them by their supervisors) that the meal break would be deducted from their hours regardless of whether they actually took the break or attempted to reverse the automatic deduction.[8]  And 42 of the declarants state that they were not provided overtime compensation for time worked through the meal breaks, but do not address why they were unable to reverse the automatic deductions.[9]  One of the deponents provided testimony that he did not make use of the process for reversing the automatic deduction because it was too time consuming (Bailey Aff. ¶ 2, Ex. B at 11), and that he was not provided a form with which to reverse the deduction when he had not taken a meal break.  (*Id.* at 47, 48.)  Another deponent testified that he chose not to fill out an "exception form" to reverse the deduction (*Id.* ¶ 2, Ex. A at 26), and also stated that he never saw any exception form.  (*Id.* at 47.)

---

[8]    Lukas Aff. ¶ 3, Ex. J(2), J(3), J(6), J(7), J(10), J(12), J(14), J(17), J(24), J(27), J(29), J(39), J(42), J(46), J(53), J(54), J(55), J(60), J(63), J(64), J(66), J(74), J(81), J(84), J(85), J(86), J(88), J(91), J(93), J(98), J(106), J(108); Bailey Aff. ¶ 2, Ex. R.

[9]    Lukas Aff. ¶ 3, Ex. J(1), J(4), J(5), J(8), J(9), J(18), J(20), J(23), J(25), J(28), J(30), J(32), J(33), J(40), J(41), J(44), J(47), J(48), J(56), J(57), J(59), J(62), J(65), J(67), J(69), J(70), J(71), J(72), J(73), J(75), J(78), J(87), J(92), J(95), J(97), J(99), J(101), J(103), J(104), J(105), J(107), J(109).

The Court notes that this count of declarations adds up to 113 rather than 112, but it is possible to read the Declaration of Wayne Feenan to fall into both the first and the second category, so the Court has counted it in each.  (Lukas Aff. ¶ 3, Ex. J(27) ¶ 8 ("I was unaware of any way to indicate in the system that I did not, in fact, take my lunch. . . . [My manager] told me that I may as well take my break, and said, 'If you don't use it, you lose it.'").)

The import of these differences is plain: the myriad reasons alleged why the deponents and declarants were not paid for untaken meal breaks do not provide a colorable basis that Plaintiffs and potential collective action members were together the victims of a *single* decision, policy, or plan.  Because these differences were exposed in a small sample of 112 waste-collection employees, we can reasonably infer that such variation would only increase were the sample extended to include the nearly 30,000 WMI employees at the more than 800 facilities nationwide to whom Plaintiffs request that notice be sent.

To the extent that there was anything close to a single or uniform theme across the sampled WMI facilities reflected in Plaintiffs' offer of proof, it is the waste-collection employees' common complaint that there was quite a bit of pressure on the drivers to work fast and to cover many pick-ups during their workday, and that this pressure left little or no time for a meal bream.  And, in fact, Plaintiffs' proof suggests that meal breaks were consistently discouraged or even, in some places, forbidden despite official WMI policy to the contrary.  But this case is not about meal-break labor practices; it is about overtime compensation for putatively thousands of employees, and Plaintiffs' showing demonstrates that there is no single policy about that core issue from which a collective action can emanate.

Plaintiffs stress that the Court should decide this motion without making inquiry into the merits of Plaintiffs' claims.  (Pls.' Mem. 27-32.)  Of course, Plaintiffs are correct that a motion for conditional certification is not an

appropriate mechanism for a court to address the merits of a plaintiff's underlying claims. *See Pagliolo v. Guidant Corp.*, Civil No. 06-943 (DWF/SRN), 2007 WL 2892400, at *3 (D. Minn. Sept. 28, 2007) ("In deciding that Plaintiffs have met their minimal burden of establishing that this case is appropriate for conditional certification, the Court does not reach or make any prediction as to the merit of Plaintiffs' claims."). This is not a situation where the Court's examination of the parties' factual submissions and arguments requires the Court to weigh the merits of Plaintiffs' claims. The Court has taken care not to consider whether Plaintiffs or putative collective members were, in fact, deprived of overtime compensation in violation of the FLSA. Similarly, the Court has made no determination of whether the Plaintiffs or putative collective members did, in fact, work more than 40 hours in a work week. *See Scott v. Heartland Home Fin., Inc.*, Civil Action No. 1:05-CV-2812-TWT, 2006 WL 1209813, at *3 (N.D. Ga. May 3, 2006) (noting that the employer's "argument that the Plaintiffs and putative class members did not work in excess of the established 40-hour work week and, therefore, were not denied minimum wage is effectively an attack on the merits of the claims"). Nor has the Court made factual findings or credibility determinations in its review of the record. *See, e.g.*, *West,* 2006 WL 1892527, at *3 (citing *Severtson II*, 141 F.R.D. at 278-79). Rather, the Court has simply concluded that the allegations before it do not provide a colorable basis that all the putative members of the collective action "sustained injury from one unlawful policy." *See Ray*, 1996 WL 938231, at *4.

14

Plaintiffs also contend that it is inappropriate at this stage for the Court to consider the "predominance of individualized issues" suggested by the evidence. (Pls.' Mem. 24-27.)  Specifically, Plaintiffs argue that "[c]onsideration of . . . potential variances is a distraction and is irrelevant to deciding whether collective treatment is appropriate for similar workers sharing in a common grievance, which is the product of the same time recordation system and practice."  (*Id.* at 25.)  It is true that the proper inquiry at this stage is not whether individual issues predominate over common issues, rather, the proper inquiry is whether Plaintiffs have shown a colorable basis that there is a single decision, policy, or plan affecting all of the individual employees, which would thus make it sensible to conditionally certify.  To the extent that the Court now looks at the many individual reasons given by the declarants and deponents for their not getting paid for work performed during meal-time, it is only to determine whether Plaintiffs have made out a colorable showing that the putative collective is similarly situated, and as discussed above Plaintiffs have not sustained the burden of such a showing.  Where the collective action requires such significant individual considerations, "it may be inappropriate for conditional certification." *See Thompson*, 2009 WL 130069, at *11 (citing *Diaz v. Elecs. Boutique of Am.*, No. 04-CV-0840E(SR), 2005 WL 2654270, at *5 (W.D.N.Y. Oct. 17, 2005), and other cases).[10]

---

[10]    After the May 21, 2009 hearing, and in support of the proposition that
(Footnote Continued on Following Page)

Other courts have denied plaintiffs' motions for conditional certification of a collective action under similar circumstances. *See Thompson*, 2009 WL 130069, at *10-11 (concluding that "although plaintiffs have submitted evidence that a tiny fraction of the 8,000 members of the putative class may not have received some of the compensation that they were due under the FLSA and under [the employer's] own published policies, plaintiffs have not established a colorable basis for their claim that [the employer] implemented a corporate decision to ignore its published policies and refuse to compensate employees [for certain tasks]."); *West*, 2006 WL 1892527, at *9 (noting that the plaintiffs' "alleged violations are contrary to the Defendants' official written policy, which precludes store managers from requiring employees to work off-the-clock and requires payment of time and one-half for all overtime hours worked"); *Basco*, 2004 WL 1497709, at *7 (agreeing with employer's argument that under the notice-stage analysis, the plaintiffs failed to provide sufficient evidence that a uniform nationwide policy existed).

---

(Footnote Continued from Previous Page)
courts should not consider any individualized issues, Plaintiffs also submitted supplemental authority in which the Western District of Pennsylvania rejected an employer's argument that the employees' claims were not "suitable for collective treatment because they required individualized inquiries." *See Kuznyetsov v. W. Penn Allegheny Health Sys., Inc.*, No. 2:09-cv-00379-DWA, 2009 WL 1515175, at *5 (W.D. Pa. June 1, 2009) (order granting motion for conditional certification). For the reasons that follow, to the extent *Kuznyetsov* stands for the proposition that a court cannot consider any individualized issues at the notice stage, the Court declines to follow such an approach.

The cases Plaintiffs rely on to support their nationwide-policy argument are unpersuasive. Neither *Craft v. Ray's, LLC*, No. 1:08:cv-00627-RLY-JMS, 2008 WL 4810546 (S.D. Ind. Oct. 29, 2008), *Ohsann v. L.V. Stabler Hosp.*, No. 2:07-cv-0875-WKW, 2008 WL 2469559 (M.D. Ala. June 17, 2008),[11] nor *Barrus v. Dick's Sporting Goods, Inc.*, 465 F. Supp. 2d 224 (W.D.N.Y. 2006), involve a situation where the plaintiffs' own proof suggested a multiplicity of reasons for the employer's failure to compensate for meal breaks through which the employees worked. *See Craft*, 2008 WL 4810546, at *2 (addressing a "policy that is applied uniformly to all [d]rivers and [s]lingers"); *see also Ohsann*, 2008 WL 2469559, at *2 (discussing an automatic-deduction policy for meal breaks as the "basis of the alleged FLSA violation," but not discussing whether the plaintiffs' proof showed varied reasons for employer's failure to compensate); *Barrus*, 465 F. Supp. 2d at 230 (conditionally certifying a collective where evidence demonstrated that employer "condoned, accepted or encouraged managers and employees to illegally reduce compensation for time spent working"). The same is true of Plaintiffs' submission of *Casemi v. Univ. of Pittsburgh Med. Ctr.* as supplemental authority. *See* No. 09-85J, 2009 WL 1361265, at *5 (W.D. Pa. May 14, 2009)

---

[11]    Plaintiffs appear to argue that in *Ohsann* the court based its decision on the mere fact that the employer used an automatic deduction policy similar to the one at issue in this case. (Pls.' Mem. 17-18 (suggesting that "evidence of a common deduction policy was sufficient for conditional certification" in *Ohsann*).) To the extent that the court in *Ohsann* decided that proof of an automatic deduction policy alone was sufficient for conditional certification, the Court does not find its reasoning persuasive.

(noting that "[t]he problem for Defendants . . . is the admitted existence of written polices affecting *all* non-exempt employees, regardless of job title or work location" and distinguishing "the many other court decisions that have, to varying degrees, examined plaintiffs' affidavits to determine whether purported deficiencies regarding 'similar situation' exist" because of the employer's admitted application of its policy to all its employees). The record here does not provide a colorable basis that the Plaintiffs and putative collective members are similarly situated with respect to a single decision, policy, or plan that caused them to be deprived of overtime compensation.

### B. Manageability

To familiarize itself with Plaintiffs' position regarding manageability, the Court inquired at the May 21, 2009 hearing how Plaintiffs would provide common proof at trial to meet the goals of judicial efficiency. Plaintiffs insisted that it was "unfair" and inappropriate for the Court to consider such issues at this stage. However, it is incumbent on a court at the conditional-certification stage to review all the evidence before it to determine whether it should facilitate notice and thereby expand the scope of litigation. Were such a complete review avoided, as Plaintiffs suggest it must be, a court would abandon its duty to determine whether the matter before it is an appropriate case for collective treatment. *See West*, 2006 WL 1892527, at *7 (noting that "neither the remedial purposes of the FLSA, nor the interests of judicial economy, would be advanced if we were to overlook facts which generally suggest that a collective action is improper"); *see also*

*Basco*, 2004 WL 1497709 at *7 ("While it is true that th[e] 'lesser' standard should not preclude certification, and 'similarly situated' does not mean identically situated, plaintiffs have failed in their burden to demonstrate identifiable facts or legal nexus that binds the claims so that hearing the cases together promotes judicial efficiency.").

In *Hoffman-LaRoche*, the Supreme Court explained that:

> Section 216(b)'s affirmative permission for employees to proceed on behalf of those similarly situated must grant the court the requisite procedural authority to manage the process of joining multiple parties in a similar manner that is orderly, sensible, and not otherwise contrary to statutory commands or the provisions of the Federal Rules of Civil Procedure. . . . It follows that, once an ADEA action[12] is filed, the court has a managerial responsibility to oversee joinder of additional parties to assure that the task is accomplished in an efficient and proper way.

*Id.* at 170-71. The Supreme Court also noted that "[a] trial court can better manage a major . . . action if it ascertains the contours of the action at the outset." *Id.* at 171-72. As these passages make clear, the Supreme Court's determination in *Hoffman-LaRoche* that district courts have the discretion to send out notice to potential members of a collective action was based on principles of orderly case management. But that focus does not mandate that district courts send out notice when it appears that an FLSA case will be unmanageable as a collective action. Nor is the notice process statutorily created. Under these

---

[12]   The fact that *Hoffman-LaRoche* involved an ADEA claim is of no consequence to the determination of the evidence a court may consider when determining whether a particular piece of litigation is an "appropriate case" for collective action.

circumstances, nothing prohibits a court from considering whether a case appears to be manageable as a collective action in considering a motion for conditional certification.

It is also appropriate for the Court to take case management into account at this stage because a collective action is simply a procedural device aimed at facilitating, in an efficient and cost effective way, the adjudication of numerous claims in one action. The focus here must be on the procedural advantages, or disadvantages, of conditional certification. Although one of the advantages of an FLSA collective action is that it may enable many adversely affected employees with small individual claims to pool their resources in one action, this is by no means the only purpose served by this procedural device. Where representative plaintiffs can show that there is a single decision, policy, or plan that adversely affects a group of similarly situated employees, then it may be worth the considerable cost to the parties and a court to go forward with a collective action. Such costs would typically include, at a minimum, the expense of sending out notice to the putative collective members, the substantial widening of discovery, and the burden on the courts of administering the thousands of claims brought by opt-ins nationwide. Plainly, it is not the case that these costs will always be unacceptable; otherwise Congress would not have created the FLSA collective action. Here, the issue is whether Plaintiffs have come forward with sufficient proof to convince the Court that such costs are appropriate in this case.

Because the evidence before the Court shows considerable variation in the reasons Plaintiffs and the putative collective action members were not compensated for working through meal breaks, the Court is left with the clear impression that this case would not be more orderly and sensibly managed as a nationwide collective action. Specifically, increasing the size and expense of this case by issuing court-facilitated notice to all 30,000 potential opt-ins identified by Plaintiffs is an inefficient method of proceeding where the evidence at this stage suggests such variation. *See Basco*, 2004 WL 14977909, at *5 ("To create a collective action class, including the cost associated with that when a Court is convinced that there is insufficient support for the same prior to certification would be an exercise in futility and wasted resources for all parties involved."). Thus, the Court concludes that Plaintiffs' motion for conditional certification and court-facilitated notice should be denied.

Because the Court has determined that this action is not appropriate for conditional certification and court-facilitated notice, it need not address Plaintiffs' argument that the statute of limitations should be equitably tolled.

## CONCLUSION

Based on the foregoing, **IT IS HEREBY ORDERED** that:

1.      Plaintiffs' Motion to Supplement the Factual Record for Conditional Class Certification, Judicial Notice, and Equitable Tolling (Doc. No. 137), is **GRANTED**; and

2.	Plaintiffs' Motion for 29 U.S.C. § 216(b) Conditional Class

Certification, Judicial Notice, and Equitable Tolling (Doc. No. 89), is **DENIED**.

Date: June 15, 2009

  *s/ Jeffrey J. Keyes*
  JEFFREY J. KEYES
  United States Magistrate Judge